J-S54038-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| JEFFREY DONALD PETERSON, | : | |
| | : | |
| Appellant | : | No. 141 WDA 2016 |

Appeal from the PCRA Order March 4, 2014
in the Court of Common Pleas of Crawford County
Criminal Division at No(s):  CP-20-MD-0000925-1992

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| JEFFREY DONALD PETERSON | : | No. 181 WDA 2016 |

Appeal from the PCRA Order January 6, 2016
in the Court of Common Pleas of Crawford County
Criminal Division at No(s):  CP-20-MD-0000925-1992

BEFORE:  BENDER, P.J.E., OTT, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.:  **FILED FEBRUARY 28, 2019**

Jeffrey Donald Peterson ("Peterson") appeals, *nunc pro tunc*, from the March 4, 2014 Order denying his first Petition for relief pursuant to the Post Conviction Relief Act ("PCRA").[1]  We affirm.

―――――――――――――――――――――――――――

[1] ***See*** 42 Pa.C.S.A. §§ 9541-9546.

J-S54038-16

This Court previously set forth the relevant underlying history of this

case as follows:

[Peterson] was charged on October 16, 1992, with two counts of criminal homicide-first-degree murder and one count of burglary in connection with the September 28, 1992 shooting of two victims. [Peterson] was found at the scene with a self-inflicted gunshot wound to the head. The Commonwealth subsequently provided [N]otice it would seek the death penalty. On September 16, 1993, [Peterson] entered a plea of guilty to two counts of first-degree murder[,] in exchange for the Commonwealth entering a *nolle prosse* on the burglary charge[,] and withdrawing its intention to seek the death penalty. On November 3, 1993, the trial court sentenced [Peterson] to two consecutive terms of life imprisonment. [Peterson] did not file any post-sentence motion[s] or a direct appeal.

On January 17, 1997, [Peterson] filed a counseled PCRA [P]etition.[2] ... On July 16, 1997[, the PCRA court] entered a Memorandum and Order which was docketed of record on July 17, 1997. The Order stated that the Court Administrator was directed to schedule an evidentiary hearing[,] and the record indicates that a copy was provided to the Court Administrator. For some unknown reason[,] that evidentiary hearing was never scheduled and that failure was not brought to the attention of the [PCRA court] by [Peterson's] counsel or anyone else until [Peterson] sent a letter to the Clerk of Courts[,] dated September 24, 2012[,] and docketed on October 2, 2012. ...

In his [first] PCRA [P]etition and at the PCRA hearing, [Peterson], citing his head injury, challenged his competency in 1993 to enter a voluntary, intelligent, and knowing guilty plea and challenged the effectiveness of his plea counsel for permitting the plea to be entered when he was incompetent. On March 4, 2014, the PCRA court issued a [M]emorandum and [O]rder denying relief on [Peterson's] PCRA [P]etition, based on its merits.

_____

2 The 1995 amendments to the PCRA provided a grace period for the filing of a first petition until January 16, 1997.

*Commonwealth v. Peterson*, 118 A.3d 459 (Pa. Super. 2015) (unpublished memorandum at 1-3) (citations and paragraph break omitted, footnote added).

This Court affirmed the PCRA court's March 4, 2014 Order, albeit on different grounds. Specifically, this Court held that Peterson's first PCRA Petition was untimely filed by one day, and that Peterson failed to invoke any of three timeliness exceptions at 42 Pa.C.S.A. § 9545(b)(1). *See Peterson*, 118 A.3d 459 (Pa. Super. 2015) (unpublished memorandum at 7-8).

On March 31, 2015, Peterson filed a second PCRA Petition, invoking the newly-discovered fact exception to the PCRA's timeliness requirements, *see* 42 Pa.C.S.A. § 9545(b)(1)(ii); claiming ineffective assistance of his first PCRA counsel for failing to timely file the first PCRA Petition; and requesting allowance to appeal the denial of his first PCRA Petition, *nunc pro tunc*. After holding a hearing on Peterson's Petition, the PCRA court entered an Order granting Peterson leave to appeal the March 4, 2014, Order, *nunc pro tunc*.

Thereafter, Peterson filed a *nunc pro tunc* appeal to this Court, from the March 4, 2014 Order. The Commonwealth filed a cross-appeal, challenging the PCRA court's January 6, 2016 Order, which granted Peterson's second PCRA Petition, thereby permitting him to file the *nunc pro tunc* appeal. On appeal, this Court reversed the PCRA court's January 6, 2016 Order, which granted Peterson's second PCRA Petition. *Peterson*, 158 A.3d 191, 2016 Pa.

Super. Unpub. LEXIS 3547, at *8 (unpublished memorandum).  This Court

explained that

> Peterson's first PCRA counsel filed a detailed, albeit untimely, PCRA Petition and an appellate brief on behalf of Peterson[,] following the denial of PCRA relief on his first PCRA [P]etition. Therefore, contrary to the PCRA court's finding, Peterson's claim regarding first PCRA counsel's defective representation did not constitute "abandonment[,]" and fails to satisfy the "unknown facts" exception to the PCRA's timeliness requirements.

*Id.* at *8-*9.

The Pennsylvania Supreme Court granted allowance of appeal, and

ultimately reversed the Order of this Court.  *Commonwealth v. Peterson*,

192 A.3d 1123 (Pa. 2018).  Our Supreme Court concluded that Peterson's first

PCRA counsel was ineffective *per se*, as counsel had filed Peterson's first PCRA

Petition one day beyond the statutory time period for filing a PCRA petition.

*Id.* at 1130.  The Supreme Court concluded that Peterson had met the PCRA's

timeliness exception set forth at 42 Pa.C.S.A. § 9545(b)(1)(ii).[3]  *Peterson*,

192 A.3d at 1130-31.  Consequently, the Supreme Court remanded to this

Court to address the merits of Peterson's appeal of the PCRA court's March 4,

2014 Order, which had denied his first PCRA Petition.  *Id.* at 1132.

On December 26, 2018, this Court filed its Memorandum affirming the

Order of the PCRA court.  *Commonwealth v. Peterson*, No. 141 WDA 2016

---

[3] Section 9545(b)(1)(ii) provides an exception to the PCRA's timeliness requirement where "the facts upon which the claim is predicated were unknown to the petitioner and could not be ascertained by the exercise of due diligence[.]"  42 Pa.C.S.A. § 9545(b)(1)(ii).

(Pa. Super. filed December 26, 2018) (unpublished memorandum). Subsequently, Peterson timely filed a Motion for Reconsideration, arguing that, applying the Pennsylvania Supreme Court's recent decision in **Commonwealth v. VanDivner**, 178 A.3d 108 (Pa. 2018), the PCRA court's analysis regarding his competency to enter a guilty plea is flawed. Reargument Petition at 2. This Court thereafter granted panel reconsideration to address the applicability of **VanDivner** to Peterson's second issue on appeal.

Peterson raises the following claims for our review:

1. Did the lower court err by finding that ... Peterson's [] plea was knowingly, intelligently and voluntarily entered into where the lower court misle[d] Peterson during the plea colloquy by advising him that, although he was pleading to a life sentence, he had a right to go before the Board of Pardons and have the life sentence modified to include a lesser, minimum sentence and an eligibility for parole?

2. Where Peterson suffered the violent destruction and removal of a substantial portion of the frontal lobes of his brain and other bullet[-]impact brain damage, did the lower court err by failing to credit the uncontroverted evidence and testimony from the only medical expert presented in the case[,] neuropsychiatrist Lawson Bernstein, M.D., that [Peterson] suffered a brain injury and damage that rendered him incompetent to make reasoned decisions, participate in his defense, and enter a knowing, voluntary and intelligent plea of guilty to two counts of first [-]degree murder?

Brief for Appellant at 5.

As our Supreme Court has explained,

an appellate court reviews the PCRA court's findings to see if they are supported by the record and free from legal error. This Court's scope of review is limited to the findings of the PCRA court and

- 5 -

the evidence on the record of the PCRA court's hearing, viewed in the light most favorable to the prevailing party, in this case, the Commonwealth. In addition, [t]he level of deference to the hearing judge may vary depending upon whether the decision involved matters of credibility or matters of applying the governing law to the facts as so determined.

*Commonwealth v. Fahy*, 959 A.2d 312, 316 (Pa. 2008) (internal quotation marks and citations omitted).

Peterson first claims that the PCRA court improperly concluded that his guilty plea was not unlawfully induced. Brief for Appellant at 16. Peterson asserts that at his plea colloquy, the trial court stated the following:

> [I]f you receive a life sentence, your sentence is life. There is no minimum term at this point. As your attorneys have explained to you, probably, you have a right to go before the Governor's Pardon Board during the time of this sentence, and ask them to set a minimum sentence so that your sentence is no longer life, but it's x amount of years to life. And then you have the right to ask to be paroled once your minimum sentence is served, but when you are sentenced, you have to go in with the understanding that right now your sentence is mandatory life, and there is no minimum, and that's up to the Governor's Pardons Board to handle at some time in the future.

Brief for Appellant at 17-18 (quoting N.T. (Plea Colloquy), 9/16/93, at 32-33). According to Peterson, the trial court's statement was misleading, and instilled him a belief that his life sentence would be converted, in a later proceeding, to "x amount of years" as a minimum sentence, and a maximum sentence of life in prison. Brief for Appellant at 18. Peterson argues that the trial court's explanation led him to believe that there is a routine administrative process governing relief from a life sentence. *Id.* at 19. Peterson asserts that the trial court's statement was convoluted and mislead him regarding what is, in

- 6 -

reality, "the extraordinary and extrajudicial right of the Governor …, with the unanimous consent of the Board of Pardons, to grant a plea for executive mercy in the form of a pardon or commutation." *Id.* On this basis, Peterson asserts that he was misled by the trial court to accept the plea based upon the incorrect statements regarding the length of his sentence. *Id.* at 22.

In its Opinion, the PCRA court addressed Peterson's claim and concluded that it is not supported in the record. *See* PCRA Court Opinion, 3/4/14, at 19-20. We agree with the sound reasoning of the PCRA court, as set forth in its Opinion, and affirm on this basis as to Peterson's first claim. *See id.*

In his second claim, Peterson asserts that his guilty plea was unknowing and involuntary because he was incompetent at the time he tendered his plea. Brief for Appellant at 22. Peterson argues that the PCRA court improperly disregarded the only medical testimony and evidence in the case, which established that Peterson's brain injury rendered him "incompetent to make reasoned decisions, participate in his defense, and enter a knowing, voluntary and intelligent plea of guilty[.]" *Id.* Peterson directs our attention to undisputed evidence that he had suffered profound brain damage, "consisting of destruction to both frontal lobes of his brain[,]" after being shot the face

with a .357 caliber revolver.[4]  *Id.* at 23.  Peterson further directs our attention to evidence that persons with his type of brain injury

> are rendered compliant and appear to be cooperative and agreeable[,] even though they have little or no ability to actually look out for their own interest, weigh, reason, or consider alternative courses of action or risks and benefits associated with the actions they are agreeing to.

*Id.* (citing N.T., 6/5/13, at 34-35).

Peterson states that the only medical expert to testify at the hearing was Lawson Bernstein, M.D. ("Dr. Bernstein").  Brief for Appellant at 24.  According to Peterson, Dr. Bernstein presented evidence that the type of neurological and neuropsychological dysfunction suffered by Peterson "robbed him[,] or severely diminished [Peterson's] capacity to engage in the type of decision-making that's described in the colloquy."  *Id.* (citation and internal quotation marks omitted).  Peterson contends that the type of brain damage he suffered rendered him incapable of entering a knowing, voluntary and intelligent guilty plea.  *Id.* at 26.  Peterson thus argues that the PCRA court abused its discretion in disregarding Dr. Bernstein's uncontradicted testimony, and unduly relying upon the testimony of Peterson's former counsel.  *Id.* at 27, 28.

---

[4] Prior to shooting the victims, Peterson had threatened to kill the victims and then himself.  N.T. (Guilty Plea), 9/16/93, at 38.  After killing the victims, Peterson was found bleeding from the face, with a .357 revolver laying on the floor next to his body.  *Id.* at 43.

In his Application for Reconsideration, Peterson alleges that the PCRA court improperly focused upon Peterson's ability to talk, while ignoring his mental deficiencies, as described by his expert. Application for Reconsideration at 7-8. Peterson claims that, since the PCRA court's 2014 determination, the law has changed regarding the appropriate analysis of a claim of intellectual disability. *Id.* at 5-6. According to Peterson, PCRA courts are now required "to engage in an analysis of evidence that focuses on a defendant's mental weaknesses, and not just mental strengths, as provided most recently in the *VanDivner* opinion." *Id.* at 6.

Peterson argues that the gunshot wound he suffered renders him "compliant[,] and makes him appear to be cooperative and agreeable, even though he has little or no ability to look out for his own interests." *Id.* at 7. Peterson asserts that he is unable to weigh, reason, or consider alternative courses of action, "or risks associated with his actions." *Id.* According to Peterson, the PCRA court improperly failed to consider his weaknesses, instead focusing on Peterson's ability to talk. *Id.* Peterson posits that, pursuant to our Supreme Court's holding in *VanDivner*, and its progeny, a trial court rendering a competency determination is required to engage in an analysis that focuses on a defendant's mental weaknesses, "and not just mental strengths[.]" *Id.* at 6. Based on the evidence presented, Peterson argues, he was not competent to tender a knowing, voluntary and intelligent plea. *Id.* at 8.

"[A] plea of guilty will not be deemed invalid if the circumstances surrounding the entry of the plea disclose that the defendant had a full understanding of the nature and consequences of his plea and that he knowingly and voluntarily decided to enter the plea." *Commonwealth v. Fluharty*, 632 A.2d 312, 315 (Pa. Super. 1993).

> "Our law presumes that a defendant who enters a guilty plea was aware of what he was doing. He bears the burden of proving otherwise." *Commonwealth v. Pollard*, 832 A.2d 517, 523 (Pa. Super. 2003) (internal citation omitted). The entry of a negotiated plea is a "strong indicator" of the voluntariness of the plea. *Commonwealth v. Myers*, 434 Pa. Super. 221, 642 A.2d 1103, 1106 (Pa. Super. 1994). Moreover, "[t]he law does not require that [the defendant] be pleased with the outcome of his decision to enter a plea of guilty: All that is required is that [his] decision to plead guilty be knowingly, voluntarily and intelligently made." *Commonwealth v. Anderson*, 995 A.2d 1184, 1192 (Pa. Super. 2010).

*Commonwealth v. Reid*, 117 A.3d 777, 783 (Pa. Super. 2015). In assessing the adequacy of a guilty plea colloquy and the voluntariness of the subsequent plea, "the court must examine the totality of circumstances surrounding the plea." *Commonwealth v. Broaden*, 980 A.2d 124, 129 (Pa. Super. 2009).

By statute,

> [w]henever a person who has been charged with a crime is found to be substantially unable to understand the nature or object of the proceedings against him or to participate and assist in his defense, he shall be deemed incompetent to be tried, convicted or sentenced so long as such incapacity continues.

50 P.S. § 7402(a). Thus, a competency determination involves an assessment of a defendant's ability, at the time of trial, to consult with counsel, participate

in his defense, and understand the nature of the proceedings.

***Commonwealth v. Hughes***, 865 A.2d 761, 788 n.29 (Pa. 2004).

> Competence to plead guilty depends upon whether the defendant has the "ability to comprehend his position as one accused of murder[,] and to cooperate with his counsel in making a rational defense," ***Commonwealth* ex rel. *Hilberry v. Maroney***, 424 Pa. 493, 227 A.2d 159, 160 (Pa. 1967); ***accord Commonwealth v. Chopak***, 532 Pa. 227, 615 A.2d 696, 699 (Pa. 1992), and whether he has "sufficient ability at the pertinent time to consult with his lawyers with a reasonable degree of rational understanding, and [has] a rational as well as factual understanding of the proceedings against him." ***Commonwealth v. Minarik***, 493 Pa. 573, 427 A.2d 623, 628 (Pa. 1981) (quoting ***Commonwealth v. Turner***, 456 Pa. 309, 320 A.2d 113, 114 (Pa. 1974)); ***accord Commonwealth v. Appel***, 547 Pa. 171, 689 A.2d 891, 899 (Pa. 1997). The determination of competency is a matter for the sound discretion of the trial court and will not be disturbed absent a clear abuse of that discretion. ***Commonwealth v. Hughes***, 521 Pa. 423, 555 A.2d 1264, 1270 (Pa. 1989).

***Commonwealth v. Frey***, 904 A.2d 866, 872 (Pa. 2006).

In ***VanDivner***, the Pennsylvania Supreme Court did not create a new test for competency as pertaining to a defendant's competence to stand trial. Rather, the ***VanDivner*** Court applied the holding of the United States Supreme Court in ***Atkins v. Virginia***, 536 U.S. 304 (2002). In ***Atkins***, the Supreme Court declared that executions of retarded criminals violated the Eighth Amendment prohibition of cruel and unusual punishment.[5]  ***See***

---

[5] The ***Atkins*** Court explained that "[t]he Eighth Amendment succinctly prohibits 'excessive sanctions. It provides: 'Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted.'" ***Atkins***, 536 U.S. at 311 (citation omitted).

*Atkins*, 536 U.S. at 321 (stating the Supreme Court's conclusion that capital punishment "is excessive and that the Constitution places a substantive restriction on the State's power to take the life of a mentally retarded offender") (citation omitted).

In *Commonwealth v. Miller*, 888 A.2d 624 (Pa. 2005), our Pennsylvania Supreme Court held that, to obtain relief on an *Atkins* claim, the defendant must show, by a preponderance of the evidence, that he is mentally retarded, as defined by the American Psychiatric Association ("APA") or the American Association of Mental Retardation ("AAMR"). *Id.* at 626-27. The *Miller* Court explained that,

> [t]he AAMR defines mental retardation as a "disability characterized by significant limitations both in intellectual functioning and in adaptive behavior as expressed in the conceptual, social, and practical adaptive skills." Mental Retardation[: Definition, Classifications, and Systems of Supports (10th ed. 2002) (Mental Retardation)], at 1. The American Psychiatric Association defines mental retardation as "significantly subaverage intellectual functioning (an IQ of approximately 70 or below) with onset before age 18 years and concurrent deficits or impairments in adaptive functioning." [Diagnostic and Statistical Manual of Mental Disorders (4th ed. 1992) (DSM-IV),] at 37. Thus, ... both definitions of mental retardation incorporate three concepts: 1) limited intellectual functioning; 2) *significant adaptive limitations*; and 3) age of onset.

*Id.* at 629-30 (footnote omitted, emphasis added).

In *VanDivner*, the Pennsylvania Supreme Court was asked to determine whether the defendant was intellectually disabled, and, thus, ineligible for the death penalty under *Atkins*. *VanDivner*, 178 A.3d at 109. In addressing this issue, the *VanDivner* Court recognized that,

- 12 -

in determining whether an individual has significant limitations *in adaptive functioning*, the focus should be on an individual's weaknesses — not his or her strengths — as [intellectually disabled] people can function in society and are able to obtain and hold low-skilled jobs, as well as have a family. This is represented in the DSM-IV and [AAIDD's] definitions by an individual's classification as [intellectually disabled] even though he may have relatively strong skills in distinct categories.

*Id.* at 117 (emphasis added) (quoting *Commonwealth v. Williams*, 61 A.3d 979, 992 (Pa. 2013). Thus, our Supreme Court's focus upon an individual's strengths was only part of its consideration of whether the defendant had "*significant adaptive limitations*," in the context of an Eighth Amendment challenge to the application of the death penalty. *See id.* Because this case does not involve an *Atkins* challenge to the application of the death penalty, our Supreme Court's analysis in *VanDivner* affords Peterson no basis for relief.

Applying the appropriate standard, the record supports the PCRA court's determination that Peterson entered a knowing, voluntary, and intelligent guilty plea, and that he failed to demonstrate a manifest injustice warranting the withdrawal of his plea. *See* PCRA Court Opinion, 3/14/14, at 3-17 (summarizing the testimony presented at the evidentiary hearing), 26-27 (addressing Peterson's claim of an unknowing and involuntary plea). The PCRA court's findings are supported in the record, and its legal conclusions are sound. *See id.* We therefore affirm on the basis of the PCRA court's Opinion with regard to this claim. *See id.*

In his third claim, Peterson argues that his plea was unknowing and involuntary, because the trial court never inquired of Peterson whether he had considered the viability of all possible defenses, "as Peterson himself understood them." Brief for Appellant at 29. Peterson contends that,

> [b]ased on the unique circumstances of this case, and indications that [he] might have some memory relevant to possible defenses, but definitely no memory of the alleged crime, the [trial] judge should have explored with [him] directly what he understood about potential defenses he might have raised and why he did not wish to pursue them….

*Id.* at 31.

In its Opinion, the PCRA court addressed this claim and concluded that it lacks merit. **See** PCRA Court Opinion, 3/14/14, at 19 (stating that Peterson offered no testimony from himself or anyone else that he was not apprised of the defenses available to him), 20 (summarizing plea counsel's testimony that counsel discussed with Peterson all possible defenses, and that Peterson acknowledged during the plea colloquy that such discussions took place). Because the PCRA court's findings are supported in the record, and its legal conclusions are sound, we affirm on the basis of the PCRA court's Opinion with regard to this claim. **See id.**

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 2/28/2019

Circulated 11/30/2018 12:04 PM
Circulated 02/19/2019 01:20 PM

IN THE COURT OF COMMON PLEAS OF CRAWFORD COUNTY, PENNSYLVANIA

Criminal Division

COMMONWEALTH

Vs.                                    :   No.   CR 925-1992

JEFFREY DONALD PETERSON          :

Douglas W. Ferguson, Esq., A.D.A., for Commonwealth
Victor H. Pribanic, Esq. for Defendant

MEMORANDUM AND ORDER

Anthony J. Vardaro, P.J.                                    March 3, 2014

The Defendant, on September 16, 1993, was facing two counts of first degree Murder with the Commonwealth seeking the death penalty for each count and one count of Burglary as a first degree felony when as the jury was assembled available to be selected, he pled guilty to two counts of Murder in the first degree for the killings of Lynette Bleutge and Scott Stivason.

He was sentenced on November 3, 1993 to two terms of life imprisonment to run consecutive to one another and filed no direct appeal.

On January 17, 1997 the Defendant, through private counsel, filed a "Petition for Post Conviction Relief".

In that petition he raised the following issues:

1. Under both the constitution of this Commonwealth and the constitution of the United States, when the Defendant entered his plea there could be no reliable adjudication of guilt or innocence because of his lack of competence and thus he was deprived of due process of law.

2. His trial attorneys were ineffective for allowing him to enter a guilty plea when he was not competent to aid his counsel in the determination of whether to enter a plea or go to trial and when he was not competent to assist his counsel.

3. Defendant's trial counsel were ineffective for failing to pursue a direct or interlocutory appeal regarding the Commonwealth's tardy notice of its intention to seek the death penalty.



EXHIBIT

B

4. The Defendant at the time of his guilty plea was not apprised of the effects of a life sentence or alternatively two consecutive life sentences versus concurrent sentences nor was he apprised of the defenses available to him including the plea of guilty by mentally ill and one of diminished capacity by virtue of intoxication or mental health. Additionally, counsel was ineffective because the Defendant could not fully communicate the events leading up to the crime and therefore no plea should have been entered without an adjudication of competency by a qualified physician or other healthcare provider.

5. The Defendant and his family were led to believe that the Defendant would be eligible for parole at some time and defenses available to him were not adequately explained by counsel or the Court with distinctions between the various degrees of criminal homicide.

6. The Defendant's guilty plea was unlawfully induced because of his incompetence to plead guilty and a representation to himself and his family that he would be eligible for parole at some point and he was unable to act on his own behalf because of his mental condition and/or by virtue of medication he was under the influence of at the time of the plea.

On July 16, 1997 we entered a Memorandum and Order which was docketed of record on July 17, 1997.

The Order stated that the Court Administrator was directed to schedule an evidentiary hearing and the record indicates that a copy was provided to the Court Administrator. For some unknown reason that evidentiary hearing was never scheduled and that failure was not brought to the attention of the Court by Defendant's counsel or anyone else until the Defendant sent a letter to the Clerk of Courts dated September 24, 2012 and docketed on October 2, 2012.

A copy of that letter was provided to the undersigned and upon reviewing it, the Court noted that there was reference to a pending PCRA before the Court.

That caused the undersigned to review this matter and a determination was made that the evidentiary hearing had never been set. Therefore we entered an Order on October 11, 2012 with an attached Memorandum directing that the evidentiary hearing be scheduled.

The Court Administrator did so on October 16, 2012 and after various requests for continuances, the hearing was conducted over a two day period, finishing on August 28, 2013.

The parties were given an opportunity to review the PCRA hearing transcripts, brief the issues and orally argue before the Court.

While the other issues have been raised as indicated, the focus of the testimony presented on behalf of the Defendant at the evidentiary hearing and the argument that followed is that the Defendant was not mentally competent to enter his plea on September 16, 1993 and his attorneys were ineffective for allowing him to enter that plea based on his mental condition at the time.

2

## TESTIMONY

The Defendant called one witness, Dr. Lawson Bernstein, who examined the Defendant sometime in the fall of 1997 and authored a report dated November 15, 1997.

Dr. Bernstein is a clinical and forensic neuropsychiatrist.

The opinions of Dr. Bernstein were based on his 1997 interview for one or two hours with the Defendant and his review of medical records pertaining to the Defendant for the time period following his self inflicted gunshot wound on September 28, 1992, after the murders of Lynette Bleutge and Scott Stivason.

Dr. Bernstein concluded that the Defendant, as a result of the self inflicted gunshot wound, suffered damage to the frontal lobes of his brain such that he suffered from encephalomalacia which was a substantial overt tissue disruption of the brain essentially destroying the frontal lobes.

He further indicated that the frontal lobes of the human brain function in determining "... the capacity to weigh, reason and consider different courses of action and the risks and benefits of such actions. And the degree of impairment in that type of capacity would increase as the complexity of the task increases. So the cognitive wherewithal to decide to tie one's shoe is different than the cognitive wherewithal to decide whether or not to proceed to trial." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 13, lines 16-23).

He further indicated the other area that would be impaired by damage to the frontal lobes of the brain involved initiation and motivation. Specifically he stated that people with frontal lobe damage can suffer from what is called abulia, which affects their ability to interact with their environment and reduces their ability to advance their own interests.

The doctor concluded that because of his cognitive abnormalities from the frontal lobes damage, the Defendant was "... a uniquely ineffective individual." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 14, line 11).

Dr. Bernstein further testified that with the type of injury to the frontal lobes sustained by the Defendant, spontaneous recovery would take two years and at that point essentially there would be no further recovery.

The doctor further testified that since the injury to the Defendant occurred on September 28, 1992 and he entered his plea on September 16, 1993, there was not sufficient time for his brain to organically heal.

The doctor further testified that specifically based on the information he reviewed and his interview of the Defendant in 1997, he concluded that the Defendant's "...presentation is considered consistent with abulia. He has paucity of spontaneous motor movements and, frankly, he had a paucity of speech." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 19, line 11-14).

3

Dr. Bernstein also noted that the Defendant had very little memory for the events leading up to the alleged homicides and the events thereafter, including the legal proceedings that took place almost a year later which the doctor found was consistent with anterograde and retrograde amnesia which occur after significant traumatic brain injury.

The doctor noted that when he interviewed the Defendant in 1997 "He [the Defendant] recounted poor memory for his pretrial hearing and for the ensuing legal events. He really couldn't give me any details about that." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 20, line 5-7).

Dr. Bernstein indicated he did a brief cognitive screening examination on the Defendant giving him the Folstein Mini-Mental Status Evaluation and that confirmed that the Defendant had "...severe deficits in kind of across the board." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 20, line 13-15).

The witness indicated that screening indicated that the Defendant suffered from diaschesis which is damage to other areas of the brain caused by the significant damage to the frontal lobe. He indicated this resulted in dysfunction of the temporal lobes and parietal lobes which affected "...short term-memory, things of that nature". (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 21, lines 12-13).

The doctor also indicated that based on history taken from the Defendant by him, the Defendant had "...a pretty significant history of alcohol abuse, really severe alcohol abuse. He never had any withdrawal seizures, but he had had blackouts. And by history taken from him, he also had episodes of delirium tremens which is episodes where you become -- you shake and can't sleep, and that sort of thing. But more importantly, you also have disturbance of cognition and you may hallucinate." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 22, line 4-11)

Dr. Bernstein concluded that based on the DSM-IV which was in effect at the time he assessed the Defendant in 1997, he diagnosed the Defendant with organic cognitive and amnestic disorder of moderate to severity which was chronic and untreated as of 1997. He also determined the Defendant had organic personality disorder due to the brain trauma, abulic type, which was chronic and untreated.

The doctor further indicated that he had diagnosed the Defendant with alcohol abuse and likely dependence but he was in remission in 1997 because he was incarcerated.

The doctor also indicated that based on the records he had reviewed, the Defendant had a history of recurrent major depressive disorder predating the September 28, 1992 injury to his frontal lobe.

Dr. Bernstein indicated that based on his review of the Presbyterian Hospital records he believed the Defendant was intoxicated at the time of the shooting.

4

Dr. Bernstein testified that prior to the Defendant entering his guilty plea on September 16, 1993, he had a psychiatric evaluation by Dr. Frank Yohe of the Meadville Medical Center on November 9, 1992 which "…was not an adequate evaluation of the individual's cognitive capacity." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 28, lines 14-15)

Dr. Bernstein also concluded that he suspected it was "…more likely than not…" that the Defendant at the time he entered his plea could comprehend that he had been charged with murder (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 29, lines 8-9), but he did not have the ability to cooperate with his counsel in making a rational defense.

In support of the latter conclusion, Dr. Bernstein indicated "…that individuals who are abulic are extraordinarily compliant. They will do practically anything that is suggested to them, especially when they are in the convalescent phase after an acute brain injury". (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 29, line 22 through pg. 30, line 1).

The second reason for that opinion was in fact parts of the Defendant's brain were missing from his injury that would be involved in critical decision making.

The doctor also testified that when the Defendant was responding to questions during the guilty plea colloquy on September 16, 1993, his "…neurological and neuropsychological dysfunction…rob[bed] the individual [the Defendant's] or severely diminish their (sic) capacity to engage in the type of decision-making that's described in the colloquy". (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 32, lines 2-5).

Dr. Bernstein indicated that he believed the Defendant did not have the capacity to engage in consultation with his lawyers as to how to proceed and could not weigh the risks and benefits of different strategies. (See Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 32, line 24 through pg. 33, line 6).

With regard to his ability to render an opinion concerning the Defendant's mental capacity at the time he entered the plea on September 16, 1993 even though he examined the Defendant four years later, Dr. Bernstein stated:

> If I took anybody in this room and they experienced the same anatomy of injury as this gentlemen, these are not - - In that first, at least, year, you're not in a position to make complicated decisions. You shouldn't buy a house. You shouldn't engage in a decision to marry someone. Anything that's high stakes that requires reflection and weighing of options and outcomes. And, again, this isn't just a traumatic brain injury that there was bruising that then resolved. This is destruction of tissue in the seat of the brain that is involved with this type of critical decision-making.
>
> We have the most well-developed frontal lobes of any mammal. That's what makes us uniquely human and gives us the capacity for self-knowledge and self-direction, more than just instinctive behavior. You remove that - - Well, back in the bad old days when we did lobotomies on people, that's effectively what this

5

is. This is a trauma-induced lobotomy. You end up with an individual who has had the critical area of the brain removed that is involved in the type of high-stakes decision-making that we are discussing. Now, granted, given some period of time there may be some spontaneous recovery, but that's a two-year window. You know, at 11 or 12 months, 99 percent of the patients with this type of injury are going to lack their capacity, not to choose what they want for dinner and not to tie their shoe, but to make a decision of this magnitude. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 34, lines 9-18 and pg. 34, lines 23 through pg. 35, line 13).

Additionally, with regard to whether the Defendant might have fallen into the 1% that would be outside the norm, Dr. Bernstein stated:

"...this is somebody with significant anterograde and retrograde amnesia, who, again, has encephalomalacia which is a big deal. There is the one in 100 patients, maybe less than that, who would have some sort of miraculous retention of such capacity, but the vast, vast majority would be as this individual is, in my opinion, or was, lacking that capacity." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 35, line 24 through pg. 36, line 5).

Finally, in his direct testimony Dr. Bernstein indicated that there are tests available to ascertain level of competence and he was surprised these were not done on Mr. Peterson.

On cross-examination Dr. Bernstein indicated that when he interviewed the Defendant in 1997 he did not recall interviewing David Truax or Gregory Keenan who were the Defendant's attorneys when he entered his plea in 1993 (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 39, line 2-5), and he did not interview anyone who saw the Defendant on the day he entered his plea on September 16, 1993. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 39, lines 9-10).

The doctor further indicated that he may have reviewed a presentence report prepared by Crawford County Adult Probation in October 1993 but no longer had his file to determine that for sure since he file had been destroyed and he assumed he did not interview Robert Stein, an adult probation officer. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 40, line 19 through pg. 41, line 5).

In regard to his review of a report authored by Dr. Frank Yohe from the Meadville Medical Center as a result of his consultation with the Defendant on November 9, 1992, Dr. Bernstein agreed that Dr. Yohe indicated "The patient realizes that he was arraigned on 11/6." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 42, lines 16 through pg. 43, line 2).

Dr. Bernstein further testified that Dr. Yohe's report stated "He [the Defendant] states that there are three charges against him; two for homicide and one for burglary." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 43, line 23 through pg. 44, line 1), and that the Defendant denied those charges to Dr. Yohe indicating he had no recollection of those incidents. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 44, lines 2-4).

6

It was further testified by Dr. Bernstein that Dr. Yohe's report indicated that in response to questioning from Dr. Yohe the report indicated " He [the Defendant] denies any psychotic symptoms at the present time. He states that even though through all of this, he is not depressed." (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 44, lines 5-10).

With regard to Dr. Yohe's reference to a mental status examination of the Defendant, the following exchange took place during Dr. Bernstein's testimony:

Q. Going down to mental status examination, sir, under that paragraph, the doctor indicated the Defendant's eye contact is good. He is cooperative.

A. You read that correctly.

Q. He knows that today is Monday, and he thinks it is November 8, instead of November 9. He knows the year. He knows person and place. He can remember three out of three objects at three minutes. For Serials Seven, he gave the answers of 93, 86, 58, 51. Is that a response - - Were those in response to the questions that were asked by Dr. Yohe.

A. You read that correctly. I was not present when he made those responses.

Q. I understand that. Now, if we start at 100, I believe the test starts at 100 on the Serial test.

A. You are correct.

Q. And you're supposed to subtract seven, the next number would be 93, and the next number would be 86?

A. But the next number after that would not be 58.

Q. I agree, sir. But the first two were right?

A. That is correct.

Q. Okay. And the next two were wrong?

A. Correct.

Q. And this is a standard test used by psychiatrists in testing memory, or doing some kind of testing?

A. Actually, it is not. As he writes in the next sentence, he wrote, quote, "Other cognitive functioning is not tested at the present time."
Q. I understand that.

A. Closed quote. If I might finish.

Q. Now --

A. I would like to finish my answer, if I could.

Q. I would like you to answer my question. Is the test that he gave a test used by psychiatrists?

A. No. You would have to give the whole test. You can't just do Serial Sevens from 100.

Q. Okay. Did you give Mr. Peterson a series of tests, the whole test?

A. Generally, that's what I do. But I don't have my file. But I'm assuming that's what I did.

Q. And what were his answers on the test; do you remember?

A. I have not committed them to memory and it's been 16 years. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 44, line 11 through pg. 46, line 5)

A Further exchange took place in Dr. Bernstein's cross-examination:

Q. Dr. Yohe indicated on the next page in the top paragraph, quote, "I think that he understands the charges against him."

A. You read that correctly.

Q. "I think at the present time he will be able to cooperate with his lawyer, although he does not remember a lawyer being present with him at arraignment, but evidently one was."

A. You read that --

Q. "There is no evidence of psychosis at the present time." Am I correct in reading what Dr. Yohe dictated?

A. Correct. I think the internal logic of it is a bit lacking, but you read it correctly. I mean, that he can't remember there was a lawyer present at his arraignment, but he was going to be able to cooperate with his lawyer is a non sequitur. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 46, lines 6-22)

8

Dr. Bernstein was further cross-examined about the Defendant providing history to him and his apparent mental condition in 1997.

The doctor further indicated that he did not recall whether he had reviewed the Defendant's plea colloquy of September 16, 1993 and indicated that his report did not mention it. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 51, line 3-10).

Further, he indicated when he saw the Defendant in 1997, the Defendant was not on psychiatric medication and therefore he could infer that the Defendant was not receiving any care at the Cresson State Correctional Institution. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 51, line 15 through pg 52, line 2).

Dr. Bernstein indicated when he interviewed the Defendant in 1997 the Defendant had a "very poor memory" for the time of the plea on September 16, 1993 and he did not spontaneously indicate that he had been mistreated at that time. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 52, line17 through pg. 53, line 7).

In response to questions from the Assistant District Attorney, Dr. Bernstein reiterated that it is a physiological fact that spontaneous recovery from the type of injury the Defendant received takes two years rather than in some cases less than two years as suggested by the Assistant District Attorney. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 53, lines 13-25).

The doctor indicated that he had not reviewed any of the Defendant's x-rays from Presbyterian Hospital. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 54, line 1-7).

Finally, on cross-examination Dr. Bernstein indicated he did believe the Defendant understood that he was charged with murder at the time he entered his plea and he had not interviewed any of the Defendant's relatives who had seen him on the day of the plea or near the time of the plea. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 54, line 17- pg. 55, line 2).

On re-direct examination Dr. Bernstein indicated that he did not order any neuropsychological testing at the time he interviewed the Defendant in 1997 because such testing would not have reflected on his condition at the time he entered the guilty plea on September 16, 1993. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 55, line 10-16).

Next the following exchange took place:

> Q. Now, as a trained neuropsychiatrist, as a trained medical doctor, several references have been put to you about people observing Mr. Peterson when he, for instance, pleaded guilty and so forth. Can you tell by looking at an individual, can you judge their competence in any way?
>
> A. No, especially in someone who is abulic. Many of his responses were monosyllabic, and that at least is delineated in the transcript, and that's pretty

9

typical. (Transcript of Dr. Bernstein's testimony of June 5, 2013, pg. 55, lines 17-25).

The final exchange on re-direct examination was as follows:

Q. And Dr. Yohe, on Page 2 of his report, describes his impression as frontal lobe injury. You agree that he suffered a frontal lobe injury; correct?

A. Yeah, I think that's beyond contention.

Q. Right. In the next to last paragraph he says, I think that he probably has a frontal lobe syndrome. What is that?

A. A frontal lobe syndrome would be the type of behavioral changes that one would see after a frontal lobe injury. And frequently, it can either be abulia, the kind of bump-on-a-log phenomenon, or sometimes you get the opposite of that. People who are wildly impulsive, and they need a sitter at the bedside, otherwise they are going to run out of the hospital and into traffic.

Q. All right. Dr. Yohe, in that same paragraph, goes on to say, and as such, we need to watch him for impulsivity, period.

A. Correct.

Q. I think that a guard should be with him at all times because with his past action, we cannot rule out suicidality 100 percent. So he recommended exactly what you said, that he needed a sitter; correct?

A. Yeah.

Q. In the first paragraph on that very same page, he says, I think that at the present time he will be able to cooperate with a lawyer, although he does not remember a lawyer being present with him at the arraignment, but evidently one was. Is that statement, in your opinion, at all consistent with either the date this assessment so-called occurred on, or the other findings in Dr. Yohe's report? In other words, are they mutually - -

A. Yeah. Yeah. As I alluded to when the gentleman was questioning me on cross-examination, I find the logic of the sentence internally inconsistent. If a guy can't remember his lawyer was there, we don't even get out of the gate as to whether he can cooperate. There are more severe problems to be assessed.

Q. Do you find anything in Dr. Yohe's assessment that even if taken as true alters your opinion, in any way, about Mr. Peterson's competence to have entered a guilty plea in September of 1993?

10

A. No. (Transcript of Dr. Bernstein's testimony of June 5, 2013, page 56, line 14 through page 58, line 5)

The Commonwealth offered no expert to rebut the opinions of Dr. Bernstein but did offer the testimony of Robert R. Stein and Gregory A. Keenan, Esquire.

Robert Stein testified that in 1992 and 1993 he was an Adult Probation Officer for Crawford County whose duties included interviewing defendants who had pled guilty or been found guilty in preparation of what was called a pre-sentence report.

He was assigned to interview the Defendant after the Defendant pled guilty as part of his preparation of his pre-sentence report.

Mr. Stein indicated that he interviewed the Defendant on one occasion at the Crawford County Correctional Facility and prior to doing so had reviewed materials from the Clerk of Court's office and the District Attorney's file.

He indicated that he took notes of the conversation he had with the Defendant concerning the Defendant's background, family, work history, assets and debts and general biographical information and that the Defendant was able to understand his questions and respond to him verbally.

Mr. Stein testified that he understood the Defendant's answers and that none of his responses were "off-the-wall".

Mr. Stein indicated that the Defendant remembered specific events leading up to the murders but could not recall the actual murders.

Specifically, Mr. Stein indicated that the Defendant related to him the following:

> He was telling me that he was having problems with Ms. Bleutge, that he was at Brian Sparks' home. He said he drank some coffee and they had discussed moving. He wanted to make sure that Mr. Sparks would be willing to help him because at times Mr. Sparks would back out at the last moment.
>
> He was telling me that the biggest problems he had with Ms. Bleutge at the time was her daughter due to the fact that she was taking his truck without permission. She was missing school and not where she was supposed to be but the biggest problem was Brandy was not accepting his authority figure. He claims that issue was resolved. And then he went on to talk about he had problems with Ms. Bleutge due to her smoking marijuana. She had stopped for a little while and then she started up again.
>
> He then was telling me that he went to the cable company. He then went to the electronic (sic) company in Greenville. Then he went to a residence of Chuck Noland; they were looking at a riffle (sic) scope. He stated that he

11

remembered being at the First Choice Bar. While there, he had something to eat and he spoke with his cousin, Rick Kiskadden. At that time, he had asked his cousin to meet him at the Highlander Bar. They met at the Highlander Bar; they drank a few more beers.

He stated that he called Jim Fields and apologized for not showing up because apparently he was going to use his stock trailer to help him move and he didn't clean it out. After he left the Highlander Bar he went back to Rick Kiskadden's place where they did some more drinking where they discussed moving belongings from Lynn's apartment.

Later he discussed speaking with his cousin Janine Onderko. And then he stated that he had called Lynn's apartment but vaguely remembers talking to her. He stated that he was crying and upset because he knew Lynn wasn't home. And then finally, he stated he did not remember - - he did not actually remember anything about the killings or what happened. And then when he woke from the surgery, he was advised of the charges and basically stated that there was a part of himself in there that he didn't know existed. (Transcript of Robert Stein's testimony of August 28, 2013, pg. 18, line 4 through pg. 19, line 18).

Mr. Stein also indicated that the Defendant told him he had no juvenile or adult criminal record which Mr. Stein verified to be correct.

Further, with regard to his family history the Defendant was able to provide information on his father, mother, and sibling, including their names, occupations, where they lived and their ages.

Additionally, Mr. Stein testified that the Defendant told him he had been engaged three times prior to this incident and that he broke off one engagement and the other two were terminated by other girlfriends. The Defendant further related to Mr. Stein that he was engaged to Lynette Bleutge for approximately one year.

Mr. Stein indicated the following with regard to what the Defendant told him:

Q. And did you ask him where he was living and how long he'd been there?

A. Yes.

Q. And what did he tell you?

A. He reported that he resided at C304 Woodland Heights, Meadville, Pennsylvania. He was living there for approximately one year and six months. He was living with Lynette, Brandy and Erin Bleutge at the time.

Q. Did you ask him if he had any prior residences?

12

A. I did.

Q. And what did he respond to you?

A. P.O. Box 300, Cochranton, Pennsylvania.

Q. How long did he tell you he was living there?

A. 18 years.

Q. Did he indicate if he was living with anybody?

A. Himself.

Q. I'd like to go down. Did you ask him with regard to his education how far he went in school?

A. Yes.

Q. And what did he tell you?

A. He reported to me that he earned his GED in 1982.

Q. And did he have any vocational training?

A. He reported to me that he had night school for welding, small engine repair, mechanical tool and die and computerized tool and die. (Transcript of Robert Stein of August 28, 2013, pg. 24, line 4 through pg. 25, line 3).

Mr. Stein indicated the Defendant was able to provide him with his height, weight, eye and hair color as well as the fact that he was an inactive Christian but still was reading the Bible.

Additionally, the Defendant provided information to Mr. Stein regarding two scars he had as well as the fact he had a drinking problem which started when his cousin died.

Mr. Stein testified that the Defendant also told him that his most recent job was for Cabot Oil from Carlton, Pennsylvania and he was earning $12.04 an hour. He indicated he had been working four years and six months for Cabot and was laid off at the time he was interviewed. Mr. Stein indicated the Defendant also told him that he had worked before that at Pipe Line Systems on Airport Road in Meadville as a welder's helper operator earning $10.00 an hour. He had worked there for four years and left to get a better job.

Mr. Stein also indicated that the Defendant reported that his sole asset was a 1989 Chevy truck valued at $9,500 and that he had a truck payment of $289.00 a month with car insurance of $766.00 a year.

13

He also reported to Mr. Stein that he enjoyed hunting, fishing and competing in archery shoots as well as carpentry.

Mr. Stein completed his direct testimony by indicating that the Defendant was responsive to all of his questions and was not evasive in any way. On cross-examination, Mr. Stein testified that he did not recall the specific date of his interview with the Defendant but that the date of the presentence report was October 22, 1993.

On cross-examination Mr. Stein indicated while he had reviewed police reports, the affidavit of probable cause and witness statements prior to speaking with Mr. Peterson, what he wrote in the presentence report as attributable to Mr. Peterson was solely based on what Mr. Peterson told him but he did not recall whether he asked Mr. Peterson any supplemental questions.

Finally on redirect, Mr. Stein stated since his report was dated October 22, 1993, his interview would have occurred before that date.

Gregory Keenan, Esquire, testified that he was a practicing attorney in the Commonwealth of Pennsylvania in 1992 and 1993 and that he was one of two attorneys who represented the Defendant with regard to the murder charges filed against him, the other being David Truax, Esquire, who passed away on July 26, 2002.

Mr. Keenan testified that he and Mr. Truax worked together representing the Defendant from the time he was charged through the time he was sentenced which included face to face meetings with the Defendant, representation at the preliminary hearing and at the time of formal arraignment.

He testified that he and Mr. Truax represented the Defendant at a pretrial hearing regarding the Commonwealth's purported tardy note that they were seeking the death penalty and that Mr. Truax had filed the necessary objection.

Mr. Keenan indicated that he attended the hearing and that a decision on that issue was rendered by the Court.

The witness testified that shortly before the time of trial a plea offer was made by the Commonwealth that the Defendant could plead guilty to two counts of First Degree Murder with two consecutive life sentences in return for the death penalty being taken off the table.[1]

Mr. Keenan indicated that he was not aware of any other offers being made by the Commonwealth, including any that would have been for a lesser charge of Murder against the Defendant.

---

[1] Mr. Keenan's recollection of the plea agreement including an agreement for two consecutive life sentences is contrary to the actual plea agreement. He testified that his files for this case had been destroyed so he did not have that available to him for review.

14

Mr. Keenan indicated that when that offer was made it was discussed with the Defendant.

He also indicated that he had met with the Defendant on numerous occasions prior to that time and he was able to converse with the Defendant.

He testified that he was able to ask questions of the Defendant and the Defendant was able to answer those questions.

Mr. Keenan further testified that he met with the Defendant prior to the September 16, 1993 plea a number of times and the offered plea had been discussed with the Defendant, including what the agreement would be with regard to two consecutive life sentences.

Mr. Keenan also indicated that the Court's ruling allowing the death penalty to go forward was discussed with the Defendant and he was told that if he pled guilty he would no longer be able to challenge further the notice that the Commonwealth was seeking the death penalty was tardy.

Mr. Keenan further indicated that the Defendant gave appropriate responses to whatever was asked of him and he was able to answer any questions put to him.

The witness indicated that prior to pleading, other degrees of Criminal Homicide, including Third Degree Murder, Voluntary Manslaughter and Involuntary Manslaughter were discussed with the Defendant.

Mr. Keenan testified that up to the time of the plea no family member of the Defendant had indicated to him that the Defendant was not mentally competent.

He also indicated that he and Mr. Truax discussed with the Defendant that he would be pleading to First Degree Murder of both decedents.

Mr. Keenan further indicated that he and Mr. Truax had gone over the criminal information with the Defendant with regard to the allegations that had been made against him.

He testified further they had discussed with the Defendant his right to a jury trial and had discussed with him the presumption of innocence.

Mr. Keenan indicated that the Defendant was never told anything other than the two life sentences would run consecutive and nothing other than life meant life with regard to the duration.

The witness indicated that the Defendant was also told that if he pled guilty ultimately it was the Court's decision as to what sentence to impose even though the life sentences were mandatory.

Mr. Keenan indicated that during his representation of Mr. Peterson, he estimated that he had met ten times with Mr. Truax and the Defendant.

15

Further, Mr. Keenan specifically stated:

> It was always my impression that Mr. Peterson understood exactly what we were communicating to him based upon his responses to what we communicated to him. (Transcript of Gregory Keenan testimony of August 28, 2013, pg. 40, lines 18-20)

Mr. Keenan further indicated that after the Defendant entered his plea on September 16, 1993 and before sentencing on November 3, 1993, he met with the Defendant and the Defendant never indicated he wanted to withdraw his plea nor did he do so in any way after he was sentenced on November 3, 1993.

Mr. Keenan indicated that no petition for reconsideration of sentence was ever filed nor was a direct appeal from the judgment of sentence.

Mr. Keenan further testified that prior to the Defendant entering his plea, he and Mr. Truax had received through discovery police reports and other information from the Commonwealth which they shared with the Defendant.

He also testified that at the time the plea was entered he heard the outline of facts stated by the District Attorney and everything that was said was consistent with the prior information that had been received through discovery.

Finally, Mr. Keenan testified that the Defendant's responses at the time of the entry of the plea were identical or similar to those he had made to his attorney's prior to the plea and that he never expressed any dissatisfaction with Mr. Truax or Mr. Keenan's representation to Mr. Keenan's knowledge.

On cross-examination Mr. Keenan testified that he did not know Mr. Peterson before he began representing him so he would not have known whether he was acting the same or similar or much different than before the self-inflicted injury he sustained.

Mr. Keenan testified that he believed that they had received all of the medical records for the Defendant from Meadville, St. Vincent and the University of Pittsburgh and that he was aware that significant parts of the Defendant's brain had been surgically removed during surgery.

Mr. Keenan testified that it was his recollection that the Defendant did not remember the events of the murder or leading up to the murder.

The witness was asked whether he or Mr. Truax had Defendant assessed by a psychiatrist or neuropsychiatry or neuropsychologist and Mr. Keenan stated:

> What I recall is that he was evaluated by a local psychiatrist by the name of Dr. Yohe. And that Dr. Yohe, as a result of his evaluation, provided Mr. Truax and I with the opinion that he was competent to stand trial and that he was capable

16

to assist in his own defense. (Transcript of Gregory Keenan's testimony of August 28, 2013, pg. 46, line 23 through pg. 47, line 2).

Mr. Keenan also indicated that he believed that he and Mr. Truax received a report from Dr. Yohe but that since the entire file had been destroyed long ago, such a report likely would have been in that file.

He also testified that he did not recall whether Dr. Yohe had done any testing or whether his contact with the Defendant was limited to a half an hour at a local hospital. He then stated:

> I recall that we, Mr. Truax and I, were comfortable in relying on his opinion based upon information he relayed to us. (Transcript of Gregory Keenan's testimony of August 28, 2013, pg. 47, lines 12-14).

Mr. Keenan testified that he did not recall exactly how much prior to the guilty plea Dr. Yohe's assessment would have been done but that it would have been months prior.

Further, he indicated that he did not recall how Dr. Yohe was selected but that Mr. Truax had a lot of criminal defense experience and that he believed he was aware of Dr. Yohe and that may have led him to select that particular psychiatrist.

Mr. Keenan testified that he was not trained in psychiatry or neuropsychiatry or neuropsychology and assumed Mr. Truax was not and that he would not have been able to make an assessment of what was really going on in the Defendant's mind and what he was capable of judging.

Mr. Keenan was shown a report from Dr. Yohe dated November 9, 1992 in the Meadville Medical Center Records and indicated that he was assuming that it was the report he was referring to but did not know if there was more information he and Mr. Truax received from Dr. Yohe that he did not recall in those records.

The Defendant's counsel read from Dr. Yohe's report and in response Mr. Keenan agreed that the only statement with regard to his competence was that he would be able to cooperate with his lawyer.

Mr. Keenan indicated that Dr. Yohe was the only psychiatrist relied upon but he could not say that the report contained in the Meadville Medical Center Records was the only documentation that he and Mr. Truax received from Dr. Yohe.

Mr. Keenan testified that he agreed that nothing in the plea colloquy addressed whether the Defendant had undergone an extensive or sophisticated psychiatric assessment.

Mr. Keenan testified that even though there were jurors ready to be selected to try the case on the day of the plea he did not recall the decision to enter the plea as being last minute.

17

## DISCUSSION

We will first address the issues raised by the Defendant but not specifically at the time of the evidentiary hearing.

The Defendant has alleged that his attorneys were ineffective in not pursuing the direct or interlocutory appeal with the Commonwealth's tardy notice of their intention to seek the death penalty.

In order to prove ineffectiveness the Defendant is required to "plead and prove by a preponderance of the evidence...that the conviction or sentence resulted from ineffective assistance of counsel which, in the circumstances of a particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." *Com. v. McGill*, 574 Pa.574, 832 A.2d 1014, 1020(2003)(quoting *Com. v. Pierce*, 567 Pa. 186, 786 A.2d 203, 213 (2001).

In order to prove that counsel was ineffective, the Defendant must establish that:
      (1) the underlying legal claim has arguable merit;
      (2) counsel had no reasonable basis for his action or inaction;
      (3) the Defendant suffered prejudice as a result.
      *Com. v. King*, 57 A.3d 607(Pa.2012).

Pa.R.Crim.P. 802, which in 1993 was Pa.R.Crim.P. 352, requires the Commonwealth to provide the Defendant with notice of aggravating circumstances it intends to submit at the sentencing hearing prior to formal arraignment unless the existence of an aggravating circumstance comes to the Commonwealth's attention after arraignment.

Here, formal arraignment occurred on March 5, 1993 and the required notice was not given by the Commonwealth until April 26, 1993.

That notice advised the Defendant that the Commonwealth contended that the aggravating factors included killing while in the perpetration of a felony, specifically Burglary and Criminal Homicide; the Defendant knowingly created the grave risk of death to another person in addition to the victim in that in killing either victim he placed the other in risk of death; that he has been convicted of Murder either before or at the time of the offense at issue and that he had been convicted of another federal or state offense committed before at the time of the offense at issue for which a sentence of life imprisonment or death was possible in that at the conclusion of the trial the Defendant would have been convicted of a state offense murdering one victim which was committed either before or at the time of the murder of the second victim.

Obviously, arguably that notice didn't really provide any information that the Defendant didn't already know but in any event as our Supreme Court determined in *Com. v. Abdul-Salaam*, 678 A.2d 342, 353(Pa.1996) sanctions for a violation of Rule 352 should be judged on a case by case basis.

18

In that case the notice was given over one month after arraignment but still approximately three months before the scheduled trial date and the Court found that that gave sufficient time for Defendant's counsel to prepare for the sentencing phase.

Here the notice was given almost two months after arraignment but the Defendant still had the notice almost five months prior to the scheduled trial.

In this case that issue is not of arguable merit and therefore the Defendant's counsel could not have been ineffective for failing to pursue an appeal.[2] Certainly if almost five months had passed since the notice was given, if trial counsel felt that was not adequate they could have asked for a continuance of the case to a later date, but they were apparently ready to proceed to trial when the plea agreement was reached.

We also note that if in fact the defendant was competent at the time he entered his guilty plea, looking at the totality of the circumstances of the record in this case, he was advised both by counsel and the Court that he was giving up his right to appeal that issue by entering his guilty plea.

Next we address the issue raised by the Defendant that he was not apprised of the effects of a life sentence or alternatively two consecutive life sentences versus concurrent sentences and that he was not apprised of the defenses available to him, including a plea of guilty but mentally ill and a plea of diminished capacity by virtue of intoxication or mental health.

First we note that the Defendant offered no testimony from himself or anyone else with regard to the issue of concurrent or consecutive life sentences nor did he offer testimony that he was not apprised of his defenses available to him including a plea of guilty but mentally ill and a plea of diminished capacity by virtue of intoxication or mental health.

In the guilty plea colloquy, the Court clearly advised the Defendant that a life sentence meant life unless there was action before the Governor's Pardons Board in the future which resulted in a minimum being set so that at the time of sentence the Defendant should assume that a life sentence means life. (Transcript of Guilty Plea Colloquy of September 16, 1993, pg. 32, line 5 through pg. 33, line 1). Further, the Court explained to the Defendant during that colloquy the difference between concurrent life sentences and consecutive life sentences and further indicated that there was no guarantee based on his plea agreement as to what the Court would do in that regard. (Transcript of Guilty Plea Colloquy of September 16, 1993, pg. 55, lines 1-24).

With regard to possible defenses, the Court explained in some detail to the Defendant the elements of Murder of the Second Degree, Murder of the Third Degree, and Voluntary Manslaughter (Transcript of Guilty Plea Colloquy of September 16, 1993, pg. 28, line 5 through pg. 30, line 21). Additionally, this Court specifically asked the Defendant at the time of his plea whether he had discussed possible defenses with his attorneys, mentioning the possible defenses of a fourth person being present, self defense or justification, being too intoxicated to have the

---

[2] Counsel indicates that perhaps the appeal should have been pursued as an interlocutory appeal and we do not believe that issue could have been pursued in such a manner but in light of our findings, that issue does not need to be discussed further.

19

requisite intent to commit First Degree Murder, other possible defenses. The Defendant indicated he was satisfied he had discussed any defenses adequately with his attorneys. (Transcript of Guilty Plea Colloquy of September 16, 1993, pg. 46, lines 3-24).

Further, Gregory Keenan, Esquire, one of the Defendant's attorneys at the time of the guilty plea colloquy, specifically noted that all possible defenses had been discussed with the Defendant and that based on what was known to the defense and a large part based on the lack of memory of the Defendant at the time of the entry of the plea, none of those defenses were viable. The Defendant agreed that in fact he had had such discussions with his attorneys. (Transcript of Guilty Plea Colloquy of September 16, 1993, pg. 46, line 25 through pg. 47, line 20).

We note that it has long been the law of this Commonwealth that a Defendant in a plea colloquy is bound by the statements he makes in open court and may not later assert grounds that contradict those statements. *Com. v. Yeomans*, 24 A.2d 1044(Pa.Super 2011).

The Defendant also raises that he and his family were led to believe that he would be eligible for parole at some time and neither counsel nor the Court discussed distinctions between the various degrees of Criminal Homicide.

Again, the Defendant has offered no testimony through himself or anyone else at the time of the PCRA hearing to support those contentions.

Additionally, as we have previously set forth, during the guilty plea colloquy it was explained to the Defendant that a life sentence meant life and any possibility of that changing would only occur through action by the Governor upon petition of the Governor's Pardons Board. Further, as we previously indicated, during the plea colloquy we explained the distinction between all three degrees of murder as well as voluntary manslaughter. (Transcript of Guilty Plea Colloquy of September 16, 1993, pg. 28, line 5 through pg. 30, line 21).

Further, during the PCRA hearing Mr. Keenan testified that prior to the Defendant entering his plea the other types of Criminal Homicide were discussed with the Defendant as well as Voluntary Manslaughter and Involuntary Manslaughter. (Transcript of Guilty Plea Colloquy of September 16, 1993, pg. 37, lines 14-22).

We finally address the issues that are really at the heart of the Defendant's contentions. Specifically that his attorneys rendered ineffective assistance of counsel when they permitted him to enter the guilty pleas he did because he was not competent and that he should be permitted to withdraw his guilty pleas because he was not competent when he entered them and therefore they were not made knowingly, voluntarily and understandably.

20

Our analysis as to whether the Defendant was competent at the time he entered his plea begins with the presumption that he was. See *Com. v. Dupont*, 545 Pa. 564, 681 A.2d 1328, 1329-30(1996).[3]

The burden is on the Defendant to prove, by a preponderance of the evidence, that he was incompetent to stand trial. In order to do so he must establish that he was either unable to understand the nature of the proceedings against him or to participate in his own defense. *Com. v. Hughes*, 521 Pa. 423, 555 A.2d 1264, 1270 (1989)

Here it appears to be conceded by the defense that the Defendant understood the charges he was facing and that he was going to go to trial on those charges prior to entering his plea to two counts of the First Degree. What is contended however is that because of the frontal lobe injury he received from the self inflicted gunshot wound, he was unable to participate in his own defense and was therefore not competent when he entered the plea.

That position is supported by the testimony of the Defendant's expert, Dr. Lawson Bernstein.

We note that Dr. Bernstein did not examine the Defendant near the time of his plea but his only examination occurred about four years after the Defendant entered that plea.

While there was much testimony offered by Dr. Bernstein, in essence his opinion was simply that because of the nature of the injury to the head sustained by the Defendant from the gunshot wound to his head on September 28, 1992 he was not competent to enter his plea on September 16, 1993 because there had not been sufficient time for his brain to organically heal. Dr. Bernstein indicated that based on his understanding, as an expert, it would take two years from the time of the injury for it to organically heal.[4]

More specifically, Dr. Bernstein testified that as a result of the self-inflicted gunshot wound, the Defendant suffered damage to the frontal lobes of his brain such that he ended up with encephalomalacia which essentially destroyed the frontal lobes of the brain.

He further opined that the frontal lobes of the human brain affect one's ability to weigh, reason and consider different courses of actions and the risks and benefits of those actions so that

---

[3] We conducted a retrospective hearing on competency in this matter without objection by the Defendant and therefore any claim that a retrospective hearing should not have been held was waived.

[4] We note that while Dr. Bernstein emphasized the full two year period for the Defendant to heal, he did on one occasion make reference to an individual not being able to make complicated decisions at least for the first year. (See Transcript of Dr. Lawson Bernstein's Testimony of June 5, 2013, pg. 34, lines 10-12)

21

the Defendant did not have the cognitive wherewithal to decide whether or not to proceed to trial.

He also opined that the Defendant, because of the frontal lobe damage, suffered from abulia which affected his ability to interact with the environment and reduced his ability to advance his own interests.

Dr. Bernstein also indicated because the Defendant had very limited memory for the events leading up to the homicides and thereafter, he suffered from anterograde and retrograde amnesia as part of the traumatic brain injury he sustained.

The doctor also indicated that he believed that the Defendant suffered from alcohol abuse and likely dependence which was of course in remission in 1997 because he was incarcerated.

Dr. Bernstein further concluded that in 1997 the Defendant suffered from moderate to severe organic cognitive and amnestic disorder as well as an organic personality disorder which was chronic and untreated.

The doctor testified when he saw the Defendant in 1997, the Defendant was not on psychiatric medication and from that he could infer that the Defendant was not receiving any psychiatric care at the Crescent State Correctional Institution.

Dr. Bernstein noted that on November 9, 1992, the Defendant had a psychiatric evaluation by Dr. Frank Yohe at the Meadville Medical Center but it was Dr. Bernstein's opinion Dr. Yohe did not adequately evaluate the Defendant's cognitive capacity.

Dr. Bernstein testified that when the Defendant was responding to questions during the guilty plea colloquy on September 16, 1993, he did not have the ability to make the types of decisions that were required in the colloquy and that he did not have the capacity to consult with his lawyers as to how to proceed. Further, Dr. Bernstein felt that the Defendant could not weigh the risks and benefits of different strategies.

On cross-examination Dr. Bernstein did not recall interviewing either of the attorneys who represented the Defendant at the time he entered his plea, nor did he remember interviewing anyone who saw the Defendant on the day he entered his plea. Further, he indicated that he may have reviewed the presentence report prepared by the Adult Probation Department in October of 1993 but he did not interview Robert Stein, the Adult Probation Officer who prepared it.

He further indicated that Dr. Frank Yohe's report as a result of his examination of the Defendant on November 9, 1992, indicated that the Defendant realized that he had been

22

arraigned on November 6, 1992 and that he was charged with two counts of homicide and one count of burglary.

He further agreed that Dr. Yohe's report indicated the Defendant stated he had no recollection of the incident.

Dr. Bernstein also testified that Dr. Yohe's report indicated the Defendant denied any psychotic symptoms and that he was not depressed.

The doctor also indicated that Dr. Yohe's report stated that the Defendant had good eye contact, was cooperative and knew that he was being interviewed on a Monday although he thought it was November 8, 1992 rather than November 9, 1992.

Dr. Bernstein agreed that Dr. Yohe's report indicated that the Defendant was oriented as to person and place and could remember three out of three objects after three minutes.

The testimony of Dr. Bernstein further indicated that Dr. Yohe's report indicated that when given the Serials Seven his answers were 93, 86, 58, 51 which showed that there was some gap in what would have been a totally correct response.

Dr. Bernstein noted that Dr. Yohe's report indicated that "other cognitive functioning is not tested at the present time."

Dr. Bernstein further indicated that since his file had been destroyed because of the sixteen years between the time he interviewed the Defendant and the hearing in this matter, he believed he had done a series of tests to determine the Defendant's cognitive functioning in 1997 but he could not remember the Defendant's answers.

Dr. Bernstein went on to indicate that Dr. Yohe's report indicated that the Defendant was able to cooperate with his attorney even though he did not remember one being present with him at the arraignment which Dr. Yohe believed had occurred and further Dr. Yohe had indicated there was no evidence of psychosis.

Dr. Bernstein further indicated in cross-examination that he did not recall whether he had reviewed the Defendant's plea colloquy of September 16, 1993 and he indicated his report did not mention that plea colloquy.

Further on cross-examination Dr. Bernstein reiterated that it was a physiological fact that spontaneous recovery from the type of injury the Defendant received takes two years.

23

Dr. Bernstein further indicated on cross-examination that he did believe the Defendant understood he was charged with murder at the time he entered the plea and that he had not interviewed any of the Defendant's relatives who had seen him on the day of the plea or near the time of the plea.

On redirect examination the doctor indicated that he did not order any neuropsychological testing when he interviewed the Defendant in 1997 because it would not have reflected the Defendant's at the time he entered the guilty plea on September 16, 1993.

Dr. Bernstein indicated that the Defendant's competence could not be judged by the people observing at or near the time he entered the guilty plea because he was abulic. He further indicated that the Defendant's responses (apparently making reference to the guilty plea colloquy) were monosyllabic and that's pretty typical of someone who is abulic.

Dr. Bernstein also noted on redirect examination Dr. Yohe had indicated that the Defendant needed to be watched for impulsivity and suicidality.

In conclusion in his redirect testimony, Dr. Bernstein indicated that based on what Dr. Yohe had heard from the Defendant there were more serious problems to be assessed and that Dr. Yohe's assessment did not change his opinion that the Defendant was not competent at the time he entered his guilty plea in September of 1993.

Robert Stein, the Adult Probation Officer, who interviewed the Defendant on one occasion at the Crawford County Correctional Facility in preparation for his presentence report, indicated that he had also reviewed materials from the Clerk of Court's office and District Attorney's file in preparing that report.

Mr. Stein indicated that he took notes of his conversation with the Defendant concerning his background, family, work history, assets and debts and general biographical information and that he felt the Defendant understood his questions and responded to him verbally and appropriately.

Mr. Stein indicated that the Defendant had told him in some detail regarding matters leading up to the murders, even though the Defendant could not recall the actual murders.

It was clear from Mr. Stein's testimony that the Defendant gave him much detailed information with regard to the Defendant's background, even to the point of remembering his most recent job and exactly how much he had been earning an hour.

24

Based on Mr. Stein's testimony those answers would not have been limited to one syllable or even one word or a few words.

On cross-examination Mr. Stein indicated he did not recall a specific date of the interview but the report was dated October 22, 1993 and on re-direct he indicated therefore his interview would have occurred before that date. .

Also on cross-examination Mr. Stein indicated that while he had reviewed the police reports, the affidavit of probable cause and witness statements prior to speaking with Mr. Peterson, what he wrote in the presentence report as being attributable to the Defendant was solely based on what the Defendant told him. He did not recall whether in response to what the Defendant indicated to him he had proposed any supplemental questions to the Defendant.

Gregory Keenan, while incorrectly recalling that the plea agreement reached called for two consecutive life sentences did indicate that when he met with the Defendant's other attorney David Truax, Esquire and the Defendant on numerous occasions he was able to converse with the Defendant.

He clearly testified that all aspects of the case leading up to the plea were discussed with the Defendant and based on the Defendant's conversations with him, he had no reason to believe the Defendant was incompetent.

He further testified that while he had received all medical reports that indicated the extent of the Defendant's brain injury and that the Defendant did not remember the events leading up to nor at the time of the murders, he was satisfied that the Defendant was competent based on not only his responses to questions from his attorneys but also, based on the evaluation done by Dr. Yohe.

Mr. Keenan indicated that he believed that Mr. Truax had received a report from Dr. Yohe and that he and Mr. Truax were comfortable in relying on Dr. Yohe's opinion that the Defendant was competent and they did not seek any further psychiatric opinion.

The witness indicated that he could not say that the report from Dr. Yohe that was contained in the Meadville Medical Center records was the only documentation he and Mr. Truax received from Dr. Yohe.

The plea colloquy of September 16, 1993 clearly shows that the Court covered the six required questions set forth currently in Pa.R.Crim.P.590 which were the same required questions in 1993. The seventh question with regard to a jury deciding the degree of guilt if the Defendant pled guilty to murder generally was not applicable.

25

With regard to the ineffective assistance of counsel claims that the Defendant was not competent to enter a plea, we initially find that the claim is of arguable merit.

Certainly if the Defendant was not competent he could not enter a knowing, voluntary and intelligent plea and he presented evidence to support that claim.

However, we do not find that he has met his burden that counsel had no reasonable basis for action or inaction.

Without getting to the issue as to whether we believe the Defendant was competent at the time he entered his plea, which we will address later, clearly, his attorneys had a report from a psychiatrist indicating that he was competent and the Defendant displayed no behavior that would have led them to believe he was not competent in their numerous meetings with him. We therefore cannot find that counsel was ineffective.

Having said that, Defendant may still be permitted to withdraw his guilty plea if he was in fact not competent at the time he entered it.

In order to withdraw a guilty plea after sentencing, a Defendant must demonstrate prejudice on the order of manifest injustice before the withdrawal is justified. *Com. v. Muhammad*, 794 A.2d 378, 383 (Pa.Super 2002). "A plea rises to the level of manifest injustice when it was entered into involuntarily, unknowingly, or unintelligently." *Id.*

Here based on the totality of the circumstances, we cannot conclude that the Defendant has satisfied that standard and should be permitted to withdraw his guilty pleas.

Certainly his expert witness opines that he was not competent to enter his guilty plea on September 16, 1993 based on his review of the records and his interview with the Defendant in 1997.

That expert maintains that because of the physiological injury, healing simply could not take place to allow the Defendant to make such important decisions for two years from when the injury occurred on September 28, 1992.

We believe based on all the testimony and the guilty plea colloquy of September 16, 1993, that opinion from the Defendant's expert simply is not correct.

The Defendant, while having no specific recollection of the incident and the specific time leading up to it, did have extensive discussions with an adult probation officer and his attorneys.

26

The discussions the Defendant had with the adult probation officer Robert Stein, clearly show that he was not giving short answers to questions presented to him without thought but instead was giving great detail in his answers to the probation officer.

Further, his attorney from that time period testified he was clearly able to converse with the Defendant and the Defendant appeared to understand what he was saying at all times.

It is clear that the Defendant had no specific recollection of committing the murders, but at the time of the entry of his pleas he heard an extensive recitation of the evidence which apparently had already been discussed with him in the past with his attorneys that certainly created a factual basis for the Defendant to enter his pleas.

The Defendant's answers at the time of the plea colloquy indicated no confusion whatsoever.

Further, we note that the only psychiatric information closest to the time Defendant entered the guilty pleas was that of Dr. Yohe which indicated that he was in fact competent to participate in his defense and therefore to enter into the guilty pleas.

We cannot find that the Defendant has met his burden of showing manifest injustice to allow him to withdraw his guilty pleas.[5]

ACCORDINGLY, we will enter the following Order:

---

[5] We note that there was no evidence presented that the Defendant was under the influence of any medication, let alone medication that would have affected his ability to understand proceedings, when he entered his guilty pleas.

27

## ORDER

Anthony J. Vardaro, P.J.                                                  March 3, 2014

AND NOW, March 3, 2014, for the reasons set forth in the attached Memorandum and after an evidentiary hearing, the Defendant's Request for PCRA Relief is DENIED.

The Defendant is advised he has a right to appeal this decision to the Superior Court within thirty days from this date.

In addition to providing copies of the attached Memorandum and this Order to counsel of record, the Clerk of Courts of Crawford County shall send a copy to the Defendant by certified mail, return receipt requested and the State Correctional Institution at which he is currently housed.

BY THE COURT,

_____
P.J.

nch

28